219 So.2d 653

## W. T. WHITWORTH
### v.
### STATE.

**8 Div. 180.**

Court of Appeals of Alabama.

Jan. 28, 1969.

Rehearing Denied Feb. 18, 1969.

signment shall list the page or pages of the transcript of the record on which the ruling is recorded. * * *"

---

W. A. Barnett, Florence, for appellant.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellant was indicted by the Grand Jury of Lauderdale County, Alabama, for the offense of assault with intent to murder. After entering a plea of not guilty, he was tried by a jury which found him guilty as charged and sentenced by the court to a term of two years in the penitentiary. His motion for a new trial being denied, appellant now appeals

One J. B. Long testified that on October 29, 1967, he was travelling with his wife in a pick-up truck on a highway in Lauderdale County; that as he drove past an intersection he saw the appellant sitting in an automobile which was parked in front of a store; that the automobile in which the appellant was riding pulled out onto the road and proceeded to follow behind Long's truck which was travelling at approximately 40 miles per hour; and that the appellant passed him and proceeded down the road in front of him until he arrived at Ashford Cates' driveway where he (appellant) turned in.

Long's testimony continued as follows:

"Q. What did Mr. Whitworth do after he got out of the car?

"A. I didn't see him when he got out of the car. When we got down even with the house he was standing on the bank and he started shooting at the truck.

"Q. What was he doing?
"A. Standing on the bank in front of the house and just before we got even with him I didn't see the gun, but I seen when he did that and he started shooting.

"Q. Did you hear a report of a gun?

"A. Yes.

"Q. How many times did you hear it shoot?

"A. I couldn't say but I would say three or more times.

"Q. Did any of the bullets hit the truck?

"A. One.

"Q. Where did it go?

"A. Came through the vent glass on the driver's side.

*     *     *     *     *     *

"Q. Were you struck by that bullet?

"A. Yes, sir."

On cross-examination, Long stated that he had nothing against the appellant except the shootings.

Deputy Sheriff May of the Lauderdale County Sheriff's Department testified that he investigated the alleged shooting and observed that there was a hole in the vent

glass of the truck and that he found a slug lying on the floor of the truck.

May then stated that he went to Ashford Cates' home where he arrested the appellant and that, upon searching the appellant, he found a .25 automatic pistol in his right front pocket.

The appellant took the stand in his own behalf and denied shooting Mr. Long and also stated that he was not in an automobile on that day. He testified that he had no feelings against Long and that there had never been any trouble between them.

On rebuttal, Mrs. Long, a witness for the State, testified that she was riding with her husband on the date in question; that she saw the appellant sitting in an automobile at a crossroad; that the appellant pulled behind them in his automobile and subsequently passed them; and that he stopped at Ashford Cates' house.

Before the jury retired, the following occurred:

"JUROR: Before we retire, will you for the benefit of myself and other members of the Jury, give the law's interpretation of intent as it applies to this case?

"THE COURT: * * * Now, 'with the intent to murder' means this, Lady and Gentlemen, it does not mean that he must have done it with a positive specific intent to see the life of Mr. Long taken,—that Mr. Long should die as a result of any act which he might be proven guilty of. What the law says as far as intention is concerned is that the Jury must believe beyond a reasonable doubt— first, that the defendant did the act, and secondly, that he did an act such as alleged in this case, shooting a pistol, and that he did that and the natural and probable consequence of his shooting the pistol, if he did that, would be to produce death. In other words, it is an intention to do an act, the natural and probable consequence of which act would be to produce death. * * *

* * * * * *

"MR. BARNETT: The Defendant reserves an exception to that statement— to the statement of the Court as to intention because it overlooks any definition—just stating the intention to do an act of which the probable consequence would be to produce death—we say that is an incorrect statement of the law because it overlooks the fact that in this type case the law requires that he intends to kill this particular person."

Appellant contends in brief that the court erred in its instruction that the defendant did not have to have a specific intent to see the life of Mr. Long taken.

The above quoted instruction given by the trial court was a statutory definition of murder and was not the common law definition of murder which is to be applied in cases of this type.

In the early case of Simpson v. State, 59 Ala. 1, the Supreme Court of Alabama stated in part:

"* * * The offense charged must be proved, and an essential element of the present offence is not only an assault with intent to murder, but the specific intent to murder Ford, the person named in the indictment. If the intent was to murder another, or if there was not the specific intent to murder Ford, there can not be a conviction of the aggravated offence charged, though there may be of the minor offence of assault, or of assault and battery.—Barcus v. State, 49 Miss. 17 (19 Am.Rep. 1); Jones v. State, 11 Smedes & M. 315; Ogletree v. State, 28 Ala. 693; Morgan v. State, 33 Ala. 413; State v. Abram, 10 Ala. 928."

And in Johnson v. State, 42 Ala.App. 511, 169 So.2d 773, this court reversed where the given instruction read as follows:

"'Now, Gentlemen, as to intent, I want to explain that further to you. An intent to kill is not a necessary element of murder in the second degree. It is sufficient if the accused person voluntarily set in motion or applied an unlawful force from

which death ensued, and of which death or great bodily harm was the natural and probable consequence of the act, however free that it might have been from the actual purpose to kill. If the person voluntarily set in motion or applied an unlawful force from which death or great bodily harm was the natural and probable consequence, then you have the intent if he intended to do that. He did not have to actually intend to kill. He must have intended to do the act from which death resulted and of which death or great bodily harm was the natural and probable consequence. Here the intent we refer to is the intent to fire the pistol.'

"Here the trial judge charged not of common law murder but as to the two statutory degrees. Having done so, he then picked up the quoted portion with respect to intent.

"Simpson v. State, 59 Ala. 1, points out that the statutory crime of assault with intent to murder not containing any definition of the word 'murder' therein used must and does refer to murder as it was known at common law before the statutory division of murder into two degrees.

"At common law the crime of murder was variously stated as the killing of a human being with malice aforethought, he dying within a year and a day of the act.

"Even were we to pose harmless error in his referring to the statutory crime of murder, under Nixon v. State, 268 Ala. 101, 105 So.2d 349, it is manifest that the matter quoted invades the realm of voluntary manslaughter. See Lewis v. State, 96 Ala. 6, 11 So. 259."

As the instruction in the instant case was a statutory definition rather than the common law definition as required, the judgment in this cause is due to be reversed and the cause remanded.

Reversed and remanded.